# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
December 7, 2011 Session

## STATE OF TENNESSEE v. JAMES ALLEN POLLARD

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-D-2820      Monte Watkins, Judge**

---

**No. M2011-00332-CCA-R3-CD - Filed September 17, 2012**

---

Defendant, James Allen Pollard, was indicted by the Davidson County Grand Jury for first degree murder, felony murder, and especially aggravated robbery. Following a jury trial, Defendant was convicted as charged. The trial court merged Defendants' murder convictions and sentenced him to life in prison for first degree murder and to 18 years to be served at 100 percent for his especially aggravated robbery conviction, which was ordered to be served consecutively to his life sentence. Defendant appeals his convictions and asserts the following: 1) that the State violated the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), when it failed to disclose evidence regarding State's witness Anthony Bowers; 2) the trial court erred by refusing to grant Defendant a continuance to investigate Anthony Bowers; 3) the trial court erred by denying Defendant's motion to suppress his statement to police; 4) the trial court erred by allowing Detective Windsor to testify regarding his opinion about whether Defendant acted in self-defense; 5) the trial court committed plain error by allowing an officer to testify regarding blood spatter; 6) the alleged errors constitute cumulative error requiring a reversal of Defendants' convictions; and 7) the trial court erred by ordering Defendant's sentences to run consecutively. After a careful review of the entire record, we affirm Defendant's convictions and the lengths of his individual sentences; however, we reverse the trial court's order of consecutive sentencing and remand for a new sentencing hearing in order for the trial court to state on the record the facts which support consecutive sentencing. *See State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Richard L. Tennant, Nashville, Tennessee, (on appeal); and Edward J. Gross, Nashville, Tennessee, (at trial), for the appellant, James Allen Pollard.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Debbie Housel, Assistant District Attorney General; and Leticia Alexander, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Suppression hearing*

Detective Jeff Wiser, of the Metropolitan Nashville Police Department, testified that he responded to the victim's apartment, where the victim had been found dead from gunshot wounds. In working with Detective Michael Windsor, also of the Metro Nashville Police Department, to develop a suspect for the shooting, Detective Wiser subpoenaed the victim's phone records, which showed calls to Lakesha Hooten around the time of the victim's death. The detectives interviewed Ms. Hooten. Ms. Hooten initially denied any knowledge of the murder and robbery but later gave detectives the names of two men she claimed were the shooters. The detectives learned that information was false, and Ms. Hooten "finally broke down and told [them] that it was her boyfriend [Defendant] who had committed the murder." Defendant voluntarily agreed to speak to detectives. Detective Wiser read Defendant his *Miranda* rights, and Defendant signed a waiver of his rights. Defendant then admitted to shooting the victim and taking a PlayStation video game system from the victim's apartment. Detectives subsequently arrested Defendant.

*Trial*

The victim's mother, Marilyn Branhan, testified that she last saw her son on March 22, 2006, when he visited her home on his lunch break from work. He had plans to come back to her house that night to sign documents for his upcoming house purchase, but he did not show up. Ms. Branham was unable to contact the victim the following day. On March 24, 2006, she drove to the victim's apartment and waited beside his car until it was time for the victim to leave for work, but the victim never came out of his apartment. Ms. Branham then asked the apartment manager to go inside to check on him, while Ms. Branham drove to her home and called the police. Shortly thereafter, the apartment manager called Ms. Branham and asked her to return to the apartment and told her that she had found the victim.

Officer Michael Clark was the first officer to respond to the shooting at the victim's residence on March 24, 2006. Officer Clark discovered the victim's body lying in the floor

of the living room inside the victim's apartment. The victim had been shot. Officer Clark testified that it did not appear that the victim's apartment had been forcibly entered. He noticed electronic equipment that appeared to have been pulled out away from the TV stand, but there were no other signs of a struggle.

Detective Wiser also responded to the victim's residence on North 8th Street. He testified that the victim was lying on his back in the living room, and he had two gunshot wounds to his head. The victim's apartment did not appear to be ransacked, but Detective Wiser noticed that it appeared as if something had been removed from the TV stand.

Several months into the investigation, the detectives developed Defendant as a suspect in the shooting. Detective Wiser interviewed Defendant about the incident. Initially, Defendant "vehemently denied taking anything" from the victim's apartment. Defendant later admitted that he took a gun and a PlayStation.

Officer William Kirby testified that he was called to the crime scene in order to assist with searching for and processing evidence. Officer Kirby testified that he had worked for the Metropolitan Police Department for approximately 13 years and that he had processed "at least" one thousand crime scenes. Officer Kirby took several photographs of the crime scene. He testified that there was blood "directly behind the victim's head against the wall and pooled beneath [the victim's] right cheek." He testified that there was no blood on the front of the victim's shirt. There were two pools of blood on the carpet beside the victim's head, and there was no other blood found anywhere else in the apartment. Officer Kirby observed "a bit of blood spatter" on the wall that was eight to ten inches away from the victim's head. Officer Kirby testified that small blood droplets, indicative of high velocity impact, were up the wall as high as six to eight inches above the carpet. Without objection by Defendant, Officer Kirby testified that, based on the direction and location of the blood spatter, his opinion was that the victim was lying on the ground at the time he was shot.

Officer Kirby testified that there was a note found on the victim's car, which was parked on the street in front of the victim's apartment. The note read, "Urgent, call me as soon as you get this message, Momma." He testified that, other than an overturned beer bottle and electronics pulled off of the TV stand, nothing in the victim's apartment appeared to be askew. Officer Kirby testified that the murder did not appear to be drug-related because he did not find anything in the victim's apartment that was indicative of the victim having sold drugs.

Reshena Barnes was dating the victim at the time of his death. She met the victim while they were students at Tennessee State University. She lived with the victim from February 17, 2006, to March 17, 2006. She moved out in order to avoid any confrontation

between her ex-boyfriend, Joseph Stewart, and the victim. She had an order of protection granted against Mr. Stewart because he had previously threatened her. Ms. Barnes testified that the victim worked at Autozone and that he was excited about buying his first house. Ms. Barnes testified that she never knew the victim to sell marijuana. The victim owned a gun that he kept in his bedroom closet.

Detective Windsor testified that the door to the victim's apartment was locked, and there was no sign of forced entry. Detective Windsor obtained the victim's phone records and determined that Lakesha Hooten had been one of the last people to call the victim prior to his death. Detective Windsor interviewed Ms. Hooten. Detective Windsor investigated the information provided by Ms. Hooten and concluded that "she was possibly being deceptive" because he was unable to verify that information. Detective Windsor testified that the gun owned by the victim was a 9 millimeter semi-automatic, which would have ejected a cartridge casing if it were fired, and investigators did not find any fired cartridge casings at the crime scene. Investigators also did not find any projectile strikes, or holes caused by the firing of a gun, inside the apartment. Investigators found an empty gun holster in the victim's bedroom.

Detective Windsor interviewed Defendant about the shooting. Detective Windsor testified that Defendant voluntarily met with him and that during the interview, Defendant signed a *Miranda* waiver form. Detective Windsor testified, over Defendant's objection, that he did not believe Defendant killed the victim in self-defense because he "did not feel that the injuries sustained by the victim lined up with [Defendant's] account of the shooting." Detective Windsor further explained that Defendant had stated that the victim, while lying on the floor, raised his arm and pointed a gun at Defendant, and Detective Windsor did not believe that Defendant would have moved "closer to the victim, closer to being in danger" to shoot the victim a second time. Defendant also demonstrated to Detective Windsor the distance from which Defendant shot the victim the second time, but Detective Windsor believed that the evidence showed that Defendant "was a lot closer [to the victim]."

Anthony Bowers, Defendant's cell mate, testified that Defendant told him that Defendant's girlfriend "Keisha" set the victim up to be robbed by Defendant. Mr. Bowers testified that Defendant told him that Keisha drove Defendant to the victim's house in order to "rob him for some marijuana," and that once inside the victim's apartment, the victim "looked like he was getting kind of suspicious" because he asked Defendant for money, but Defendant did not have money to purchase the marijuana. Defendant then pulled out a gun and he and the victim "started tussling, and in the middle of the tussle [Defendant] shot [the victim] in the head." Defendant told Mr. Bowers that he thought the victim was trying to get a gun. After he shot the victim, Defendant searched the victim's apartment for valuables

and took a cell phone, a pistol, and some marijuana, and "before he left [Defendant] shot [the victim] again because [Defendant] said [the victim] was still – he was still alive and he didn't want him to be able to identify him." Mr. Bowers testified that Defendant told him that he shot the victim in the head twice. He testified that Defendant had stated that he shot the victim with a .38 caliber revolver and that Defendant "several times [ ] would always comment that that was the gun you use if you were going to murder someone . . . [b]ecause it didn't leave any shells."

Defendant told Mr. Bowers that he had been arrested after detectives questioned Defendant's girlfriend about phone calls she made. Mr. Bowers testified that Defendant told his girlfriend to tell detectives that someone else had taken her phone and that she had taken "some guys" over to the victim's house and they robbed him. Detectives tried to verify that information and discovered it to be false. Then detectives "broke [Defendant's girlfriend] down and she wound up telling the truth, that [Defendant] was the one that had done it." Defendant did not tell Mr. Bowers that he took the victim's PlayStation.

Mr. Bowers testified that he was not offered anything by the prosecution in exchange for his testimony. About coming forward with this information, Mr. Bowers testified:

> [A]t first I had a hard time coming forward because me and [Defendant] we become [sic] friends, but I constantly reflect back on the time when I was out dealing drugs and realized that the same thing could have easily happened to me. And if my family had to go through that, I would wish that someone would have the courage to step up and give any information that they have.

Mr. Bowers was incarcerated in federal prison having been convicted of "drug conspiracy." Mr. Bowers had previously been convicted for "drugs and reckless endangerment." On cross-examination, Mr. Bowers testified that he did not recall Defendant making any statements to him about the victim having a gun, but he "believe[d] they were wrestling." Mr. Bowers testified "[Defendant] was tussling with [the victim] and [Defendant] shot [the victim]."

Medical examiner Thomas Deering performed the victim's autopsy. Dr. Deering testified that the victim sustained two gunshot wounds to the head. The victim was shot in his chin, and Dr. Deering testified that the stippling pattern around that wound indicated that the shot was fired from between six inches to two feet away. Dr. Deering testified that the shot to the victim's chin caused significant bleeding and that the victim swallowed and aspirated "a moderate amount of blood" from that wound, indicating that the victim was still living after the shot. The victim was also shot in his left temple, which was the fatal shot,

and the soot and stippling around that wound indicated that the shot was fired from within six inches of the victim's head. The bullet that entered the victim's temple traveled a straight path "for the most part" from the victim's left to right and fractured the victim's skull and brain. Dr. Deering recovered both bullet jackets and some bullet fragments. Dr. Deering testified that the toxicology report revealed that the victim's blood alcohol level was .04 percent and that he had a "very small amount" of Carboxy-THC, a byproduct of marijuana, in his system.

On behalf of Defendant, Earl Campbell testified that he was a former Metro Nashville Council Member and worked at the Davidson County Clerk's Office. He knew Defendant "when he was a young boy" and Defendant had helped his father clean at the Madison Church of Christ. Mr. Campbell testified that Defendant was "a good kid" and that he worked hard. Mr. Campbell testified that "back then [Defendant] seemed to be very honest."

Defendant's father, James Pollard, Sr., testified that Defendant had been working for him at his cleaning service company full-time for four years. Defendant had lived with Mr. Pollard, and Mr. Pollard testified that Defendant had "a couple of PlayStations." On cross-examination, Mr. Pollard testified that he knew about Defendant's charges, and Defendant "didn't show [him] no remorse about nothing." Defendant's mother, Cherrion Pointer, testified that Defendant had lived with her until he was 18, 19, or 20 years old, when he began living with his father. She testified that Defendant was a reliable person and Defendant had just received a graduation certificate from Cornerstone Christian Academy.

*Sentencing hearing*

At the sentencing hearing, a presentence report was entered into evidence. The victim's mother, Marilyn Branham, and brother, James Branham, testified that the victim's murder had greatly affected their family and had caused a substantial amount of grief. Defendant did not testify or present any other proof at the sentencing hearing.

*Motion for new trial*

At the hearing on Defendant's motion for new trial, the Assistant District Attorney General Deborah Housel, who prosecuted Defendant's case, testified that on January 5, 2007, in response to a discovery request from Defendant, she reported that there was no exculpatory evidence known to the prosecution at that time. In a letter dated January 29, 2009, General Housel notified defense counsel of four additional witnesses, including "Anthony Bowers (federal inmate)," which the State intended to call at trial. She also prepared and filed a writ of habeas corpus ad testificandum in order to have Mr. Bowers

transported to Defendant's trial scheduled for February 9, 2009, and she faxed a copy to defense counsel.

General Housel testified that she called defense counsel on February 2, 2009, and "had a long and lengthy discussion." She told defense counsel that Mr. Bowers' attorney had contacted her and told her that Mr. Bowers had "information regarding admissions that were made by [Defendant] to him." General Housel also told defense counsel that she had interviewed Mr. Bowers along with Detective Windsor, and that the State had initially elected not to use Mr. Bowers' testimony at Defendant's trial because Mr. Bowers had been accused of raping another inmate. However, General Housel also told defense counsel on February 2, 2009, that Mr. Bowers had since "been cleared of all wrongdoing concerning [the rape allegation]," and that the State intended to have Mr. Bowers brought to court, although she "had no clue whether or not he was going to testify for [the State] or not." General Housel testified, however, that in light of the strength of the State's case against Defendant, she did not believe she needed to call Mr. Bowers as a witness. General Housel invited defense counsel to "feel free to come by, look at all the file, and the letter [written to General Housel by Mr. Bowers], and all the information regarding the rape." General Housel recalled that defense counsel "came over to [her] office one day and [she] gave him the box with all the information in it." She testified that she showed defense counsel the letter from Mr. Bowers.

General Housel testified that she met with defense counsel again on February 6, 2009, and she "brought the entire file for [defense counsel] to look through. [She] opened it, showed him everything" and gave defense counsel the opportunity to make copies of the file, which included the letter from Mr. Bowers and information regarding the rape allegation and investigation. General Housel testified she was "one hundred percent positive that [she] went into great detail with [defense counsel], all of the allegations that were made and the letter [Mr. Bowers] sent [her]."

General House testified that she believed that Mr. Bowers "was going to get consideration for his testimony," but that she did not know what relief, if any, he received in federal court. She testified that she did not tell defense counsel that Mr. Bowers was eligible for a sentence reduction in exchange for his testimony "because [she didn't] know that that's true." She told defense counsel that all she could do for Mr. Bowers was "put in a good word" for him to Assistant United States Attorney Blanche Cook, who was assigned to Mr. Bowers' case. General Housel acknowledged that she sent an email to Ms. Cook following Defendant's trial, advising Ms. Cook that Mr. Bowers "did a fabulous job" and General Housel wrote, "I know I can't help Mr. Bowers but if I could, I would certainly give him any consideration and break I could. He provided crucial testimony."

General Housel testified that she met with Mr. Bowers on November 30, 2007. Another Assistant District Attorney, Katie Miller, accompanied her to that meeting to discuss a case in which Mr. Bowers offered some information. Ms. Housel did not know of any other cases in which Mr. Bowers had provided assistance to the prosecution. Ms. Housel testified that Mr. Bowers "was not a possible witness until [she] found out that he had been cleared of the rape allegation."

Attorney Jack Seaman testified that he represented Mr. Bowers in federal court at a hearing on a "Rule 35" motion to reduce Mr. Bowers' sentence in 2008, prior to Mr. Bowers having testified at Defendant's trial. Mr. Seaman explained that a Rule 35 motion is filed by the government in order to seek a reduction in a defendant's sentence based on assistance he provided to the government. In Mr. Bowers' case, the motion was denied. Mr. Seaman testified that he represented to the federal court that Mr. Bowers "provided information and assistance regarding at least five people that got convicted" and in one case in which the defendant pled guilty, and that Mr. Bowers "provided assistance in the prosecution of a couple of people but he [was] not called as a trial witness." At the time of Mr. Bowers' resentencing hearing, Mr. Seaman did not believe that Mr. Bowers would be called as a witness in Defendant's case "because of accusations he was involved in a gang rape."

On cross-examination, Mr. Seaman testified that he contacted General Housel "[m]ultiple times" to offer Mr. Bowers' assistance in Defendant's case, and Ms. Housel advised that the State was not interested in Mr. Bowers' testimony "because the case was so strong." Mr. Seaman recalled a conversation with General Housel after Mr. Bowers was accused of rape in which General Housel advised Mr. Seaman that she was "absolutely" not going to call Mr. Bowers to testify. Mr. Seaman acknowledged that General Housel contacted him in January, 2009, to inquire about the rape allegation, and Mr. Seaman informed her that the rape allegation was false. General Housel then asked Mr. Seaman to find out whether Mr. Bowers would still testify, and Mr. Seaman was doubtful that Mr. Bowers would testify because he had already had his resentencing hearing. Mr. Seaman testified that Mr. Bowers did not benefit from his testimony in Defendant's case. Mr. Seaman also testified that he did not inform General Housel about other cases in which Mr. Bowers provided assistance.

Attorney Edward Gross, Defendant's trial counsel, testified that he became aware of Anthony Bowers on January 30, 2009, when he received a fax from General Housel that listed four additional potential State's witnesses. Mr. Gross testified that in a "subsequent conversation," General Housel disclosed that Mr. Bowers' testimony was regarding a "jailhouse confession" and that there had been "a rape case against Bowers but he was exonerated on that." General Housel stated that she was unsure whether Mr. Bowers would be called to testify. Mr. Gross testified that if he had more time, he "would have done

everything [he] could to have tried to follow up on this." Mr. Gross acknowledged that General Housel had "been very open and very forthcoming, as she always is in every case" and that she had offered for Mr. Gross to copy her file which was "probably eight to nine inches thick." He testified that General Housel told him that her file was "basically the same as [his]," and Mr. Gross did not look through the file, although he did not think that General Housel "would have objected had [he] gone through it line by line, sheet by sheet."

Mr. Gross testified that he was not made aware of the letter from Mr. Bowers to General Housel; however, on cross-examination, he acknowledged that General Housel told him that she had received a letter from Mr. Bowers and that he remembered General Housel "paraphrasing the contents of the letter." Mr. Gross testified, "General Housel and I had spoken pretty regularly about Bowers, and – even to the fact that she didn't know whether he would testify[.]" Mr. Gross testified that he listened to the audiotape of General Housel's interview with Mr. Bowers on the morning before Mr. Bowers testified. Mr. Gross was aware of the allegations against Mr. Bowers and that "he had been cleared." However, Mr. Gross was "not aware, or made aware, of the factual basis" for the allegation, and had he known, he would have cross-examined Mr. Bowers about it. Mr. Gross testified, "I would have used anything I could have to have shown any possible motive on his behalf other than the goodness of his heart."

Mr. Gross was not aware that Mr. Bowers had provided assistance in any prosecutions other than the one in which Assistant District Attorney Katie Miller also met with Mr. Bowers with General Housel present. Mr. Gross testified that he "distinctly remembered" General Housel telling him that "there was nothing that [she] could do to help [Mr. Bowers]." Mr. Gross testified, "General, in my opinion you told me – you disclosed everything that you knew." Mr. Gross testified that he believed that "the most damning testimony" was that of the medical examiner and the firearms expert. He testified, "I would say these two coupled together were the things that we just weren't able to overcome."

*Analysis*

## I.    Alleged *Brady/Giglio* violations

Defendant asserts that the prosecution violated his due process right to a fair trial by failing to disclose significant impeachment evidence regarding the State's witness Anthony Bowers. Defendant contends that the State should have produced information related to Mr. Bowers' credibility, specifically, information that he had provided favorable testimony in other cases and information regarding his involvement in an alleged prison rape. Defendant also alleges that the State did not disclose that Anthony Bowers would testify against Defendant until "the very eve of trial." The State responds that Defendant has failed to

establish that the State purposefully withheld information from Defendant, and the State further asserts that even if the information alleged by Defendant to have been withheld was provided, Defendant has failed to show that it would have affected the outcome of the trial. We agree with the State.

In *Brady v. Maryland*, the United States Supreme Court held that the prosecutor has a duty to furnish exculpatory evidence to the defendant. 373 U.S. at 87. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. *State v. Marshall*, 845 S.W.2d 228 (Tenn. Crim. App. 1992). The Supreme Court in *Brady* reasoned that a fair trial and a just result could not be obtained when, at the time of trial, the prosecution suppressed information favorable to the accused. *Brady*, 373 U.S. at 87-88.

Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Information useful for impeaching a witness is considered favorable information that the prosecutor may not withhold. *Giglio v. U.S.*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). And, while *Brady* does not require the State to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. *State v. Reynolds*, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). The duty does not extend to information that the defense already possesses or is able to obtain or to information not in the possession or control of the prosecution. *Banks v. State*, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).

Before this court may find a due process violation under *Brady*, the following elements must be established:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the

evidence. *Id.* When determining the materiality of undisclosed information, a reviewing court must establish whether "in [the] absence [of the information, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). In other words, evidence is considered material only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. *Id.* at 433-34 (quoting *U.S. v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

Furthermore, in situations where there was only a delayed disclosure of exculpatory information, in contrast to a complete failure to disclose exculpatory information, *Brady* does not apply, unless the delay itself causes prejudice. *See State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993).

The prosecution notified Defendant of its intent to call Mr. Bowers as a "potential" witness on January 29, 2009, eleven days prior to trial. On February 2, 2009, the prosecution disclosed to defense counsel that: (1) Mr. Bowers' attorney, Jack Seaman, had notified the prosecution that Defendant made admissions to Mr. Bowers while the two men were incarcerated together; (2) that the prosecutor had spoken to Mr. Bowers and initially decided not to use him as a witness for the State because Mr. Bowers had been accused of rape while incarcerated; (3) that Mr. Bowers "had been cleared of all wrongdoing" regarding the rape allegation; and (4) that the prosecutor was still uncertain about whether or not Mr. Bowers would testify at trial. Defendant asserts that these representations were "grossly factually inaccurate and highly misleading." On February 6, 2009, General Housel brought her file to a meeting with defense counsel and gave defense counsel the opportunity to look through and copy any or all of the file. On February 9, 2009, the first day of trial, defense counsel orally moved the trial court to grant a continuance to allow defense counsel to investigate Mr. Bowers. The trial court denied the request and allowed defense counsel to question Mr. Bowers in a jury-out hearing on the second day of trial. During the jury-out hearing, Mr. Bowers testified that the reason he came forward was because he remembered "back when [he] was selling drugs. The same thing could have happened to [him] and [he] was thinking about what [his] family would have went [sic] through." Mr. Bowers testified that he had not been promised anything by the State and that he had nothing to gain from testifying against Defendant. He also testified about his prior convictions.

Defendant contends that the State failed to disclose information contained in its file that Mr. Bowers had been accused of participating in a brutal attack on a fellow inmate, Jon Plew. Defense counsel testified at the motion for new trial hearing that had he known about the allegations against Mr. Bowers, he would have attempted to impeach him and challenge his representation that he came forward against Defendant out of concern for the victim's family. Defendant contends that the State also failed to disclose information contained in

-11-

its file that Mr. Bowers hoped to gain favor at a resentencing hearing based on his cooperation with the State pursuant to Federal Rule of Criminal Procedure 35(b). Defendant introduced as an exhibit at the motion for new trial hearing transcripts from Mr. Bowers' resentencing hearing, at which Mr. Bowers testified as to several instances in which he provided assistance to the government in hopes of receiving a reduced sentence. At the resentencing hearing in the U.S. District Court, the court found that Mr. Bowers was undeserving of any relief.

We conclude that Defendant has satisfied the first prong of the *Brady* inquiry. It is undisputed that Defendant made a discovery request for any exculpatory evidence in the State's possession. Defendant also specifically requested the substance of any statement made by Defendant to another person whom the State anticipated calling as a witness. It is also clear that the evidence presented by Defendant at the hearing on his motion for new trial would have been favorable to him at trial. Evidence that Mr. Bowers had offered testimony in several prosecutions in exchange for consideration of a reduced sentence, as well as evidence regarding Mr. Bowers' involvement in the alleged beating of Mr. Plew in prison could have been used by Mr. Gross to impeach Mr. Bowers.

Regarding whether the State suppressed this information, the State asserts that Defendant presented no evidence that the State purposefully withheld information regarding Mr. Bowers. We agree. At the hearing on Defendant's motion for new trial, General Housel testified that it was "open file discovery" and she gave defense counsel "the opportunity to look and copy and distribute anything that he wanted in the file." She denied knowledge that Mr. Bowers had testified favorably for the prosecution in other cases, except one in which another Assistant District Attorney accompanied her to meet with Mr. Bowers, and Mr. Gross testified that he had listened to that interview prior to Mr. Bowers' testimony. General Housel also denied that she promised any consideration to Mr. Bowers for his testimony, explaining that the she did not believe there was anything she could do to assist Mr. Bowers. In fact, Mr. Bowers did not receive any consideration by the State in exchange for his testimony in this case other than "a good word" from General House. General Housel also testified that if she had any additional exculpatory information regarding Mr. Bowers, she would have provided it to defense counsel, and Mr. Gross testified that he believed General Housel was forthcoming and disclosed all the information about Mr. Bowers that the State had in its possession. Defendant has not shown that the prosecution had any of the "undisclosed" information presented at the motion for new trial hearing in its possession prior to trial. Therefore, Defendant has failed to establish the second prong of *Brady*.

In order to establish that the information was material, Defendant must show that there is a reasonable probability that had the evidence been disclosed to the defense, the

results of the proceeding would have been different. *Kyles*, 514 U.S. at 434. We conclude that the evidence presented by Defendant at the motion for new trial hearing was not material. General Housel testified that she did not intend to call Mr. Bowers as a witness not only because of the accusations against him, but also because she did not perceive his testimony to be necessary to prove the State's case. She testified that the State's case was strong without Mr. Bowers' testimony based on Defendant's own statement to investigators, which was inconsistent with the evidence introduced at trial. Mr. Gross also acknowledged that the key prosecution witnesses were the medical examiner and firearms expert. We agree. Defendant has failed to show that there is a reasonable probability that impeaching Mr. Bowers with the information presented at the motion for new trial hearing would have changed the outcome of his trial.

Because all four *Brady* factors must be established in order to afford Defendant relief, and we have concluded that Defendant has failed to establish two of the factors, Defendant is not entitled to relief on this issue.

## II.    Denial of continuance

Defendant asserts that the trial court abused its discretion by denying Defendant a continuance in order to further investigate Mr. Bowers. Defendant orally moved the trial court for a continuance on the first day of trial. Defendant contends that the trial court did not set forth any reasons for its denial of Defendant's request for a continuance. The following exchange was had regarding this issue:

> [Defense counsel]: . . . . , Mr. Bowers is incarcerated I think in Manchester, Kentucky. I have not had a chance to interview him or talk with him. [Defendant] has asked that I ask that this matter be reset so I would have a chance to talk with him.
>
> THE COURT:     This trial being reset?
>
> [Defense counsel]: This trial, yes, if Your Honor, please.
>
> THE COURT:     Well, that is not going to happen. All right.
>
> [Assistant District Attorney]:     And, Judge, [defense counsel] and I have spoken about this a number of times, and we are not sure whether Mr. Bowers will be transported today. The request has been made, the Writ Your Honor signed, and we anticipate that he will be here Wednesday morning.

-13-

What I spoke to [defense counsel] about is Tuesday night, before he gets here, I will give [defense counsel] a copy of the – we taped everything that was said between Mr. Bowers, myself and Detective Windsor and I would provide that to [defense counsel] so he hears everything that Mr. Bowers said prior to him getting here.

I have been reluctant to give it to him before that because if he decides not to testify then, obviously, he is incarcerated and, you know, he might very well get down here and say he doesn't want to testify. I don't know what will happen when he gets here.

THE COURT: Well, additionally, if he does decide to testify, I will give [defense counsel] an opportunity to speak with him. I don't know whether or not he will speak to [defense counsel] or not, but I will give him that opportunity. And I will also allow a jury-out to kind of hash out what is what on this matter.

The State argues that Defendant has mischaracterized the trial court's ruling as a "foregone conclusion." It is clear from the record that the trial court gave defense counsel an opportunity to interview Mr. Bowers and cross-examine him in a jury-out hearing, which defense counsel did. The State further asserts that Defendant has failed to establish prejudice.

The granting of a continuance rests within the sound discretion of the trial court. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the denial of the continuance denied the defendant a fair trial. *Id*. This Court has recognized that a continuance might be appropriate in order to afford a defendant a "reasonable opportunity" to locate a witness. *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). However, the burden rests with the defendant to show that a continuance might have reasonably resulted in locating the witness. *Id*.; *see also Brown v. State*, 489 S.W.2d 855, 857 (Tenn. Crim. App. 1972).

In his brief on appeal, Defendant asserts that "the denial of a continuance deprived him of a fair trial and caused an outcome that would not have occurred, otherwise." However, Defendant does not state how he was prejudiced or how the outcome of his trial would have been different had the trial court granted a continuance. A mere allegation, not

-14-

supported by the record, is insufficient to support the granting of a continuance. *See State v. Bennett*, 798 S.W.2d 783, 788 (Tenn. Crim. App. 1990).

Defendant contends that "it is quite probable that at least some of the abundant impeachment evidence would have been discovered" had counsel had adequate time to investigate Mr. Bowers. We have already determined that counsel was provided notice prior to trial that Mr. Bowers was a potential witness for the State. Nothing prevented counsel from investigating Mr. Bowers prior to trial. It is Defendant's burden to show what additional information would have been discovered had the continuance been granted. Defendant has failed to show this. Defendant is not entitled to relief on this issue.

## III.    Motion to suppress

Defendant asserts that the trial court erred by denying his motion to suppress his statement to detectives. Specifically, Defendant contends that detectives lacked probable cause to interview Defendant because the information provided by Lakeisha Hooten was not credible, and that he was subjected to the functional equivalent of a custodial interrogation before he waived his *Miranda* rights, and therefore, his entire statement, including his post-waiver statement, should have been suppressed.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to the facts *de novo*, however. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to safeguard this privilege against compulsory self-incrimination. *Id*. at 444, 86 S. Ct. 1602. More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. Those safeguards include the now familiar *Miranda* warnings – namely, that the suspect be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an

attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479, 86 S. Ct. 1602. If the police fail to provide these warnings, any statement obtained as a result of custodial interrogation will not be admissible at trial during the prosecution's case-in-chief, even if the statement is otherwise voluntary. The *Miranda* Court was concerned that the "interrogation environment" created by interrogation and custody would "subjugate the individual to the will of his examiner" so as to undermine the privilege against compulsory self-incrimination. *Id*. at 457–58, 86 S. Ct. 1602. In *Dickerson v. United States*, the United States Supreme Court reaffirmed that "*Miranda* and its progeny . . . govern the admissibility of statements made during custodial interrogation in both state and federal courts." 530 U.S. 428, 432, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); *see also State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). Consequently, if the defendant's statement resulted from custodial interrogation, the statement must be excluded from evidence because the police failed to provide the defendant *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *Walton*, 41 S.W.3d at 86.

*Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. 1602. Thereafter, the United States Supreme Court has explained that "interrogation" refers not only to express questioning but also to any words, actions, or practices that the police should know are reasonably likely to elicit incriminating information from a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *see also Walton*, 41 S.W.3d at 85.

The disputed issues in this appeal are: (1) whether Defendant was "in custody" during the first seven minutes of the interview before he waived his *Miranda* rights; and (2) whether the detectives' words and conduct prior to the *Miranda* warnings were the functional equivalent of an interrogation, rendering subsequent confession inadmissible. To resolve this issue, we consider "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). This test is "objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question." *Id*. Factors relevant to this objective assessment include:

> the time and location of the interrogation; the duration and character of the
> questioning; the officer's tone of voice and general demeanor; the suspect's
> method of transportation to the place of questioning; the number of police

-16-

officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id*.

Defendant concedes that he voluntarily met with police. It is unclear from the record how Defendant was transported to the interview. At the hearing on Defendant's motion to suppress, Detective Wiser could not recall whether Defendant transported himself or whether he was transported in a patrol car; however, at trial, Detectives Wiser and Windsor both testified that they believed that Defendant was transported to the interview in a police car.

The videotaped recording of Defendant's interview on July 14, 2006, is the most helpful piece of evidence regarding this issue. According to the counter on the video, at 14:38:20, or 2:38 p.m., Detective Windsor entered the interview room in which Detective Wiser is seated across a table from Defendant. Both detectives sat across the table from Defendant. Detective Windsor was closest to the door, which was across the table from Defendant, and the door was closed during the interview. Defendant was not handcuffed or restrained. Defendant did not ask or attempt to leave the room. Detective Windsor is clearly armed with a holstered handgun. The detectives spoke to Defendant in a casual and conversational tone. Detective Windsor acknowledged that Defendant was "nervous" and suggested that Defendant "relax." Detective Wiser then acknowledged that withholding information is "a heavy burden" and encouraged Defendant to tell the truth. Detective Wiser stated that they knew what happened but that they needed to know "the particulars." Detective Windsor stated that they knew that the victim owned a gun. Detectives then explained to Defendant that they believed that his co-defendant lied to them in order to protect Defendant but that she had finally admitted to them what had happened. The detectives stated that they knew that Defendant had gone to the victim's apartment to buy "a small amount of dope," and Detective Windsor speculated that the victim was armed and Defendant felt threatened. Detective Windsor also stated that unless Defendant explained otherwise, they would have to assume that this was "a cold-blooded killing." At 14:45:35, Detective Wiser told Defendant that he would read Defendant his rights before they took Defendant's statement, and Defendant nodded affirmatively. Detective Wiser then read Defendant's *Miranda* rights and Defendant signed a waiver form. Thereafter, Defendant

-17-

told the detectives that he shot the victim in self-defense during a struggle, and Defendant acted out his version of the events. Defendant admitted to having taken the victim's gun, cell phone, and PlayStation.

Defendant analogizes the facts of this case to those in *State v. Dailey*, 273 S.W.3d 94 (Tenn. 2009), in which the Tennessee Supreme Court determined, based on the totality of the circumstances, that the interrogation of the defendant Dailey was custodial. In its order denying Defendant's motion to suppress, the trial court distinguished the facts in this case from those in *Dailey* and found:

> This case is different from *Dailey*. The defendant was not asked questions prior to being read his *Miranda* rights. For approximately 7 minutes, the detectives in a casual conversational tone spoke with defendant Pollard about their discussions with the [co-defendant]. During this approximate 7 minutes timeframe, the detectives did the talking and did not ask defendant Pollard any questions. There was a continual flow of conversation and then the detectives informed the defendant of his *Miranda* rights before any questions were asked. The defendant affirmatively waived his *Miranda* rights. Furthermore, this interview was one continuous interview not two separate interrogations.

Defendant also cites *State v. Northern*, 262 S.W.3d 741, 750 (Tenn. 2008), in which our supreme court held that "[t]he functional equivalent of express questioning refers to 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" First, we agree with Defendant that the detectives statements and actions were intended to elicit an incriminating response from him. Therefore, unlike the trial court, we conclude that the entire interview, including the pre-*Miranda* portion was an interrogation, even though detectives did not ask specific questions of Defendant before giving the *Miranda* warning. However, as discussed below, we conclude under the totality of the circumstances in this particular case that Defendant was not in "custody" at anytime prior to the *Miranda* warning being given.

Defendant is also correct that the facts in *Dailey* are very similar to the facts of this case; however, there are some notable differences. In *Dailey*, "[t]he character of the questioning was accusatory and demanding[.]" In this case, the detectives were not accusatory or demanding and their demeanor was not threatening, although their statements to Defendant were "aimed at convincing the Defendant that the police already had sufficient evidence to convict him of murdering the victim and that he had to give them an explanation." *See Dailey*, 273 S.W.3d at 103. The most notable difference between *Dailey*

and this case is that Dailey did not waive his *Miranda* rights until after he had confessed to killing the victim.

In fact, in all of the cases relied upon by Defendant, law enforcement gave *Miranda* warnings after the defendants had already confessed. Defendant urges this Court to employ the analysis set forth in *Missouri v. Siebert*, 542 U.S. 600, 124 S. Ct. 2601 (2004), in which a divided Supreme Court addressed the two-step interrogation process in which police question first and warn later. The plurality opinion set forth several factors used to determine whether the "late *Miranda* warnings are effective." This same analysis was employed by the Tennessee Supreme Court in *Dailey* and *Northern*. However, we need not apply this analysis because, as noted below, unlike in these cases, Defendant did not make any pre-warning statements to detectives.

Defendant asserts that "the lengthy pre-*Miranda* interrogation, in which he made multiple admissions, violated his right against self-incrimination and the post-*Miranda* statement is the fruit of that poisonous earlier interview (and of the illegal seizure)." We disagree. Defendant contends that he made several pre-*Miranda* admissions during the "lengthy" seven-minute pre-*Miranda* interview. Specifically, Defendant asserts that he agreed with the detectives' statements that he was present in the victim's house, that he had a gun, that he didn't know the victim very well, and that the victim felt threatened by Defendant. Defendant does not cite where in the record these admissions are found, but we have to assume that he is referring to the videotaped interview, which actually shows that Defendant did not make any verbal statements to detectives before his *Miranda* warnings. Although it is difficult to discern from the downward angle of the video, Defendant may have nodded his head in response to some of the detectives' statements, but we do not interpret a slight nod of Defendant's head to mean that he agreed with the detectives' statements, and we certainly do not interpret it as an affirmative admission.

The first seven minutes of the interview consists of the detectives talking to Defendant in a non-threatening manner and Defendant having little or no response. As the trial court found in its order denying Defendant's motion to suppress, the detectives did not question Defendant prior to giving *Miranda* warnings. Further, Defendant did not speak about the incident until after he waived his *Miranda* rights. Defendant's entire confession, in which he reenacted a struggle between himself and the victim, was made after he waived his *Miranda* rights. We do not believe the detectives in this case used questionable tactics to coerce an involuntary statement from Defendant. As both detectives testified, they attempted to make Defendant feel comfortable and at ease in the hopes of obtaining his confession. Detective Windsor acknowledged that some of his statements to Defendant were deceptive, but they were intended to elicit a response from Defendant. We have

already determined that the pre-warning portion of the interview was an interrogation. However, Defendant made no incriminating response prior to the *Miranda* warnings.

We also conclude that Defendant was not in custody during the pre-*Miranda* portion of the interview. Defendant voluntarily met with detectives; Defendant was not restrained during the interview; Defendant never requested to leave the interview; and detectives were not accusatory or demanding in their tone or demeanor. In fact, after Defendant confessed to shooting the victim, detectives gave Defendant a can of soda and left the room. Defendant drank the soda and then excused himself to the restroom, apparently unescorted. Again, however, we note that Defendant made no incriminating response prior to waiving his *Miranda* rights. In sum, because Defendant's entire confession was made after he voluntarily waived his *Miranda* rights, we conclude that the trial court did not err in denying his motion to suppress his statement.

Finally, we address Defendant's claim that detectives lacked probable cause to place Defendant in custody. Defendant asserts that information provided by a co-defendant must meet the standard set forth in *State v. Jacumin*, 778 S.W.2d 430 (Tenn. 1989), in which the Tennessee Supreme Court held that a determination of probable cause to issue a search warrant based on information provided by a criminal informant must satisfy a two-prong analysis: (1) there must be a basis for the informant's knowledge, and (2) the informant's credibility must be established. *Id*. at 432-36; *see also State v. Tays*, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992) (applying the same two-prong analysis to the determination of probable cause for an arrest as opposed to a search warrant). Defendant concedes that, as a co-defendant, Ms. Hooten's "basis of knowledge" was established; Defendant asserts, however, that Ms. Hooten's "credibility and veracity were utterly lacking." In his argument, Defendant ignores the uncontroverted evidence that Defendant voluntarily agreed to be interviewed. We need not address whether the information provided by Ms. Hooten was reliable because we have already determined that Defendant was not in custody during the interview. There is nothing in the record to suggest that detectives detained Defendant without probable cause in order to extract his confession. Detectives Defendant is not entitled to relief on this issue.

## IV.    Opinion testimony on self-defense

Defendant asserts that the trial court erred by allowing Detective Michael Windsor to testify that he did not believe that Defendant killed the victim in self-defense. Specifically, Defendant argues that: 1) Detective Windsor should not have been permitted to give a lay opinion and that his opinion testimony invaded the province of the jury as it was regarding the ultimate issue for the jury to decide; 2) Detective Windsor's opinion was actually an expert opinion, but Detective Windsor was not qualified as an expert; and 3)

Detective Windsor's opinion was based, in part, on facts outside the record. The State responds that: (1) Defendant has waived this issue by not making a contemporaneous objection at trial; (2) and even if the issue is not waived, Detective Windsor's testimony was based on his own observations and the trial court properly instructed the jury regarding the testimony.

Detective Windsor testified at trial that while interviewing Defendant, he suggested that Defendant might have killed the victim in self-defense in order "[t]o give [Defendant] an out to, basically make him feel like he had a reason to tell me why he did what he did." He further explained that Defendant "needed a reason to have his actions minimized and that is what we attempted to do." Without objection, Detective Windsor also testified that there was nothing at the crime scene that made him think that Defendant had acted in self-defense. Detective Windsor then testified that he did not believe Defendant killed the victim in self-defense. Defense counsel objected on the basis that the question called for testimony regarding the ultimate issue in the case, which was for the jury to determine. The trial court allowed Detective Windsor to testify but instructed the jury as follows:

> All right. Ladies and Gentlemen, the question was asked of the detective to, basically, state an opinion. He can give a lay opinion based upon his investigation. Again, it is not an expert opinion, it is a lay opinion, and the ultimate issue is determined by the jury itself and not by him. You can answer the question. All right.

Detective Windsor then testified that "[b]ased on [his] prior investigation and talks with Ms. Lakeisha Hooten, and by observing the evidence at the crime scene, and by [Defendant's] statements," he did not believe Defendant acted in self-defense. Detective Windsor testified that he "did not feel that the injuries sustained by the victim lined up with [Defendant's] account of the shooting." Detective Windsor testified, "I believe he was a lot closer [to the victim] and I believe you will hear testimony from [the] medical examiner that would better explain that."

The State asserts that Defendant has waived this issue because Defendant did not make a contemporaneous objection to the question asked by the State, "Was there anything at the scene that made you think it was self-defense?" to which Detective Windsor responded, "No." *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). However, Defendant clearly objected to Detective Windsor's opinion testimony regarding self-defense. Therefore, we will consider the issue on the merits.

Opinion testimony is not objectionable merely because it embraces an ultimate issue before the jury. Tenn. R. Evid. 704. However, opinion testimony by lay witnesses must meet the requirements of Tennessee Rule of Evidence 701, which provides:

> (a) Generally. – If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>> (1) rationally based on the perception of the witness and
>> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). Rule 701 requires that both (a)(1) and (a)(2) be satisfied.

In *State v. Dolwin Deon Cormia*, No. E1999-01504-CCA-R2-CD, 2000 WL 343793 (Tenn. Crim. App. at Knoxville, filed April 4, 2000), *perm. app. denied* (Tenn. Nov. 6, 2000), a panel of this Court held that the trial court did not abuse its discretion when it allowed an eyewitness to testify that in her opinion, the defendant did not shoot the victim in self-defense. In that case,

> [t]he eyewitness, who was in traffic behind the victim's rental car during the incident that led to the victim's death, testified in great detail about her observations. She observed the driver and the back-seat passenger jump on the front-seat passenger "kind of all at once" and out of nowhere. At first, she thought they were "horsing around," but then she saw two or three guns and the defendant angling his gun down over the victim. She saw what she presumed was a gun being fired, a gun flying out the window, and the back-seat passenger "casually" getting out of the car and retrieving the gun.

*Id*. at *5.

Over the defendant's objection, the witness was allowed to testify that based on what she saw, she did not think that the defendant fired the gun in self-defense. She testified, "[t]hey were attacking him from what I saw." *Id*. at *6. This Court concluded that

> the context in which the phrase self-defense was used in the questioning of the independent eyewitness is not necessarily coextensive with the legal definition of self-defense. . . . The opinion testimony of the independent eyewitness concerned whether the defendant was an aggressor in the situation or whether he was acting defensively, rather than whether his actions met all the elements of a complete defense to the prosecution. . . .

-22-

As such, the opinion rendered by the witness may fairly be characterized as not embracing the so-called "ultimate issue."

*Id*. at *7 (citations omitted).

This case is distinguishable from *Cormia*. In that case, the witness was an actual eyewitness to the crime. In this case, Detective Windsor's opinion testimony was based not on his own observations, but rather on the observations of another expert witness, the medical examiner. Rather than being "rationally based on [his] perception," Detective Windsor's testimony, that Defendant was closer to the victim than Defendant claimed, was instead "rationally based on the perception" of the medical examiner that there was soot and stippling on the victim's temple, indicating that he was shot at close range. *See* Tenn. R. Evid. 701(a)(1). Therefore, Detective Windsor's testimony regarding self-defense should not have been admitted.

Nevertheless, we conclude that the error in allowing Detective Windsor's opinion testimony regarding self-defense was harmless. The observations upon which Detective Windsor based his opinion were properly admitted through the testimony of the medical expert and other witnesses. Further, the trial court instructed the jury to draw its own conclusions regarding the issue of self-defense. Therefore, Defendant is not entitled to relief on this issue.

## V.     Non-expert testimony about blood spatter

Defendant asserts that the trial court erred by allowing Officer William Kirby to testify that, based on the blood spatter on the wall behind the victim's head, the victim was shot while lying on the floor. Defendant concedes that he did not object to this testimony at trial, and has therefore waived plenary review of the issue, but Defendant asserts that it was plain error for the trial court to allow the testimony.

Typically, a party's failure to make a contemporaneous objection to trial testimony will result in a waiver of the issue on appeal. Tenn. R. App. P. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, . . . ." Tenn. R. App. P. 36(b).

In conducting a plain error review, a court will reverse for plain error only if:

(a) The record . . . clearly establish[es] what occurred in the trial court;

(b) a clear and unequivocal rule of law [has] been breached;

(c) a substantial right of the accused [has] been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); *see also State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). It is the defendant's burden to show that the trial court committed plain error and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." *State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010) (citing *State v. Bledsoe*, 226 S.W.3d 349, 354-55 (Tenn. 2007)). Moreover, a court need not consider all five factors when it is clear from the record that at least one of them cannot be satisfied. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

We agree with Defendant's assertion that Officer Kirby's testimony regarding the blood spatter should have been offered as expert testimony because his opinion was predicated upon specialized knowledge that is unfamiliar to most lay persons. *See State v. Melson*, 638 S.W.2d 342 (Tenn. 1982) (recognizing "blood stain analysis" and the analysis of blood spatters as a field of expertise). However, we disagree with Defendant's assertion that "[i]t is clear that a non-expert witness testified as to blood spatter." Because Defendant did not object to the testimony, Officer Kirby was not qualified by the trial court as an expert. Officer Kirby testified that he had been a police officer for "[a]lmost 23 years" and all but ten years were spent in the Police Identification Crime Scene Section. He also testified in detail about what blood spatter is and what about a crime scene blood spatter indicates. Officer Kirby might not have been an expert in blood spatter; however, because Defendant did not object, there is not a sufficient basis to make that conclusion. *Adkisson* factors (b), (c), and (e) do not apply. Defendant has failed to carry his burden of establishing all five *Adkisson* factors. Defendant is not entitled to relief.

## VI.    Cumulative error

Defendant asserts that the cumulative error doctrine requires reversal of his convictions. Defendant contends that even if none of the errors individually are determined to be prejudicial, their cumulative effect mandates a new trial. However, since we have determined that the trial court erred in only one of the issues raised on appeal, and that error was harmless, there is no cumulative error for us to consider. *See State v. Mickens*, 123 S.W.3d 355, 397 (Tenn. Crim. App. 2003).

## VII.   Consecutive sentencing

Defendant contends that the trial court erred by imposing consecutive sentences. Specifically, Appellant argues that the trial court did not make the requisite specific findings under *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995), that would allow consecutive sentencing as a dangerous offender.

"When reviewing sentencing issues . . . , the appellate court shall conduct a *de novo* review on the record of such issues.  Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct."  Tenn. Code Ann. § 40–35–401(d).  "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).  In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements.  Tenn. Code Ann. §§ 40-35-103(5), -210(b); *Ashby*, 823 S.W.2d at 169.  The defendant bears "the burden of showing that the sentence is improper."  *Ashby*, 823 S.W.2d at 169.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently.  *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984).  A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the following seven factors exists:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

At the conclusion of the sentencing hearing, the trial court found that consecutive sentencing was proper based on consecutive sentencing factor (4), and it explained its reasoning as follows:

> The Court has to look to [T.C.A. § 40-35-115] with regard to multiple convictions, and make a determination as to whether any of these factors apply.

> The Court believes that factor number four does apply, that the Defendant is a dangerous offender, whose behavior indicates little or no regard for human life, and no hesitation for committing a crime, in which risk to human life is high.

> Taking that into account, as well as what the victim's mother testified to and what the Court has observed about the Defendant, that he has no remorse for the crimes that he committed, the Court believes that the especially-aggravated-robbery sentence should run consecutive to the life sentence.

As in this case, if a trial court rests its determination of consecutive sentencing on the basis of a defendant's status as a "dangerous offender," the court must make two additional conclusions of law, as required by *State v. Wilkerson*, 905 S.W.2d at 938. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must make conclusions of law that an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, that consecutive sentencing is reasonably related to the severity of the offenses. *Wilkerson*, 905 S.W.2d at 939. Moreover, trial courts must make specific findings of fact which support the *Wilkerson* conclusions of law before imposing consecutive sentences. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). In the instant case, there is no evidence in the record that the trial court even considered the *Wilkerson* factors before ordering consecutive sentencing. We therefore reverse the judgments solely as to consecutive sentencing and remand to the trial court for a new hearing on whether the sentences should be served consecutively or concurrently. If the trial court determines that the sentences should be served consecutively based upon the "dangerous offender" classification, then the trial court shall specify the facts in this case which the trial court relies upon to establish the *Wilkerson* factors.

## CONCLUSION

For the foregoing reasons, we affirm Defendant's convictions and the length of the sentences, but remand to the trial court for a new sentencing hearing as to whether the sentences should be served consecutively or concurrently.

_____
THOMAS T. WOODALL, JUDGE